UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

JOSEPH BROOKING,

                          Plaintiff,

v.                                                          1:15-CV-0510
                                                            (GTS/CFH)
THOMAS MATTOX, in his Individual
Capacity; and JAMIE WOODWARD,
in her Individual Capacity,

                          Defendants.

———————————————————————————

APPEARANCES:                                OF COUNSEL:

SUSSMAN & WATKINS LAW FIRM                  CHRISTOPHER D. WATKINS, ESQ.
  Counsel for Plaintiff
331 East 70th Street
New York, New York 10021

HON. ERIC T. SCHNEIDERMAN                   ADRIENNE J. KERWIN, ESQ.
Attorney General for the State of New York  Assistant Attorney General
  Counsel for Defendants
The Capitol                                 DENISE P. BUCKLEY, ESQ.
Albany, NY 12224                            Assistant Attorney General


GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

      Currently before the Court, in this employment civil rights action pursuant to 42 U.S.C.

§§ 1981 and 1983 and N.Y. Exec. L. § 296(6) ("NYHRL § 296(6)") filed by Joseph Brooking,

("Plaintiff") against Thomas Mattox and Jamie Woodward ("Defendants"), is Defendants'

motion for summary judgment.  (Dkt. No. 45.)  For the reasons set forth below, Defendants'

motion for summary judgment is granted.

# I.  RELEVANT BACKGROUND

## A.  Plaintiff's Complaint

On July 5, 2015, multiple claims in Plaintiff's Complaint were dismissed in response to Defendants' motion to dismiss Plaintiff's Complaint for failure to state a claim.  (Dkt. No. 27 [Decision & Order, 7/5/2016].)  Of the claims alleged in the Complaint, the only surviving claims allege that Defendants retaliated against Plaintiff for complaining of discrimination in violation of 42 U.S.C. §§ 1981 and 1983, and that they aided and abetted retaliatory conduct in violation of NYHRL § 296(6).  (Dkt. No. 1, at ¶ 69 [Compl.].)  Plaintiff's requested relief includes compensatory damages, punitive damages, reinstatement or award of front pay, and the award of reasonable attorneys' fees.  (*Id.* at ¶ 70.)

## B.  Undisputed Material Facts on Defendants' Motion for Summary Judgment

Before reciting the undisputed material facts in this case, the Court notes that Plaintiff has made a significant number of denials of Defendants' asserted facts, stating specifically that the evidence cited by Defendants did not support the asserted facts.  (Dkt. No. 52, Attach.1, at ¶¶ 67-72, 84-85, 113-71, 175, 180, 188-90, 196, 199 [Pl.'s Rule 7.1 Resp.].)  However, not only does the evidence cited by Defendants support their asserted facts, but Plaintiff's denials either (a) do not include any citations whatever, or (b) include citations that do not actually support his denials.  (*Id.*)  Similarly, Plaintiff has made a number of denials based on the existence of evidence not cited by Defendants; however, the evidence Plaintiff cited does not support those denials.  (*Id.* at ¶¶ 54, 57-59, 73, 80, 82, 87-89, 101-02, 107-08, 197.)  As a result, all of these facts are deemed admitted based on Plaintiff's failure to properly deny them in accordance with

N.D.N.Y. L.R. 7.1(3).[1]

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and expressly admitted by Plaintiff in his response thereto or denied without appropriate record citations.[2]  (*Compare* Dkt. No. 45, Attach. 51 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 52, Attach. 1 [Pl.'s Rule 7.1 Resp.].)

1.    Defendant Jamie Woodward was employed by the Department of Taxation and Finance ("DTF") from 1980 until she retired in July 2013.

2.    Woodward was employed by the DTF as a Deputy Commissioner of the Office of Tax Processing from June 2007 until April 2008, when she was promoted to Executive Deputy Commissioner, a position she held until she retired.

3.    In 2009, in addition to holding the position of Executive Deputy Commissioner, Woodward took the position of Acting Commissioner of the DTF.

---

[1]    *See N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with N.D.N.Y. Local Rule 7.1[a][3]); *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiff's S.D.N.Y. Local Rule 56.1 statement but declined to provide record citations in support).

[2]    The Court notes that many of the paragraph numbers Defendants provided with regard to Woodward's declaration were often not correct; however, because the Court was easily able to find the cited statements within the declaration, it has considered these statements to be cited with sufficient specificity for the purpose of this Statement of Undisputed Material Facts.

4.      Woodward was Acting Commissioner of the DTF until 2011 when Defendant Thomas Mattox was appointed as Commissioner.

5.      When Woodward retired from the DTF, she did not retain any documentation, including e-mails, that she created during the course of her employment there.

6.      As Executive Deputy Commissioner, Woodward's duties included the following: (a) providing strategic and operational leadership for the agency; (b) providing oversight of the day-to-day operations of the DTF in accordance with the policy set by the Commissioner; (c) effectuating the Department's vision, mission, and goals through management of the agency; (d) working closely with program managers and senior staff to ensure that the DTF operations were consistent with the Commissioner's and the Governor's policy direction; (e) managing and allocating scarce resources across competing program areas; and (f) representing the Commissioner in official capacities.

7.      Mattox was employed as Commissioner of the DTF from January 2011 through January 2015.

8.      As Commissioner, Mattox's duties included the following: (a) oversight of all administrative functions and activities pertaining the establishment and support of New York State tax policies; (b) compliance with and enforcement of state laws and regulations associated with more than 40 individual and commercial tax programs; and (c) provision of taxpayer services.

9.      Mattox is a member of the same race-based protected class as Plaintiff and is approximately the same age as Plaintiff.

10.   During Mattox's term as Commissioner, all senior members of the DTF, including Plaintiff, had an obligation to recognize the Albany, New York, office located at the W.H. Harriman Campus as the DTF's headquarters given the fact that nearly 50 percent of the DTF's 5,000 employees were based in Albany.[3]

11.   Albany serves as the capital of New York State; therefore, access to the Governor's staff, the Legislature and its staff, and senior members of other state agencies was facilitated by the DTF's headquarters location.

12.   Plaintiff was appointed as Director of the Office of Affirmative Action ("OAA") in 2008.[4]

---

[3]    Plaintiff denies this fact, asserting that evidence shows that his "official work station" was designated first in Manhattan and then in Brooklyn; however, Defendants' statement does not discuss where Plaintiff's official work station or main office was located, but rather where the DTF's headquarters was located.  (*Compare* Dkt. No, 45, Attach. 51, at ¶ 11 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 52, Attach. 1, at ¶ 11 [Pl.'s Rule 7.1 Resp.].)  Because Plaintiff's denial does not respond to the asserted fact, this fact is deemed admitted.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's responses shall . . . admit[] and/or deny[] each of the movant's *assertions* in matching numbered paragraphs.") (emphasis added); *Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts); *cf Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or material facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

[4]    Plaintiff denies this fact "as characterized," noting that he did not actually assume the role of Director until spring of 2009.  (Dkt. No. 52, Attach. 1, at ¶ 16 [Pl.'s Rule 7.1 Resp.].)  However, in the deposition testimony that Plaintiff cites, he admits that he was in fact appointed (and saw an increase in his paycheck) sometime in 2008, although he was not announced as Director until spring of 2009.  (Dkt. No. 45, Attach. 3, at 11:2-6 [Pl.'s Dep.].)  Plaintiff therefore has not cited evidence contradicting Defendants' factual assertion.  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *N.Y. Teamsters*, 426 F.3d at 648-49.

13. Woodward held the position of Executive Deputy Commissioner when Plaintiff was appointed to lead the DTF's diversity and affirmative action program in 2008.

14. In 2009, the OAA became the Office of Diversity and Affirmative Action ("ODAA").

15. As Director of the ODAA, Plaintiff reported to Woodward as his direct supervisor and to Mattox as his second level supervisor.

16. Plaintiff's position was classified as "exempt" and "management/confidential," which is a non-statutory position that is exempt from the competitive examination and interview process required for other New York State agency positions.

17. As such, Plaintiff was politically appointed to an executive level position at the direction of then-Governor Patterson's office, and he served at the pleasure of both the Commissioner of the DTF and the Governor.

18. Upon Plaintiff's appointment as Director, he became a member of the DTF's Senior Staff and Executive Leadership Group ("ELG").

19. The Senior Staff included Woodward's "key direct reports" (including all those on Executive Row), while the ELG was a broader group of leaders within the DTF that included the Deputy Commissioners, division managers, and bureau directors for the various units within the division.

20. After the OAA became the ODAA, the DTF provided Plaintiff and the ODAA with a substantially increased staff, intending and expecting to raise the profile of the office; the DTF and Woodward were committed to the goals and objectives of affirmative action and diversity in the workplace.

21.    From the time Plaintiff became Director until the time he retired in June 2013, he had a long history of not only failing to properly perform the requirements of the position of Director, but also of failing to follow the directions and orders of his superiors, including the following: (a) failing to attend mandated meetings; (b) ignoring repeated directives to work at the DTF's headquarters in Albany, New York; (c) continuously failing to advise his supervisors of his whereabouts to the point where he could often not be located; (d) failing to perform duties and assignments himself and instead repeatedly delegating his responsibilities to subordinates; (e) failing to appropriately supervise subordinates; (f) allowing DTF assignments to be continuously late, not completed, or not prepared well; (g) allowing investigations of discrimination complaints to be delayed for extended periods of time;and (h) and allowing responses to both the EEOC and the New York State Department of Human Rights ("DHR") to be inexcusably late on numerous occasions.[5]

---

[5]    Plaintiff denies this "broad negative characterization," arguing that it is not reflected by the actual facts; however, Plaintiff does not cite to specific facts that contradict this characterization.  (Dkt. No. 52, Attach. 1, at ¶ 27 [Pl.'s Rule 7.1 Resp.].)  Plaintiff notes only that he has made positive impacts as ODAA Director and that he never received any performance evaluations or written counseling before the date he was terminated.  (*Id.*)  However, the fact that Plaintiff had some successes during his tenure as Director and that he never received formal evaluations or discipline does not contradict the asserted fact involving deficiencies in aspects of Plaintiff's performance as Director.  Notably, Plaintiff failed to cite any evidence showing that did not engage in the activities described by Defendants to some extent.  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *N.Y. Teamsters*, 426 F.3d at 648-49; *see also Baity*, 51 F. Supp. 3d at 418.  These facts are therefore deemed admitted.

22.    At all times relevant to this litigation, the DTF's principal offices were located in Albany, including the principal ODAA office.[6]

23.    Ellen Mindel was based in the Albany office when she served as manager of the OAA.

24.    Throughout Woodward's employment as Acting Commissioner and as Executive Deputy Commissioner, Woodward maintained her office in Albany, New York.

25.    Indicating the level of executive support of the ODAA and to promote personal interactions between Plaintiff and the other executives, the DTF provided Plaintiff with an office on the executive floor of the DTF's offices (known as Executive Row) and paid all his travel expenses to and from Albany.

26.    When Plaintiff was first appointed as Director of the ODAA, Woodward ordered Plaintiff to attend all ELG and Senior Staff meetings, all of which took place in Albany, New York.

27.    Woodward eventually started to memorialize directives about being in the Albany office as often as required and attending ELG and Senior Staff meetings in e-mail correspondence to Plaintiff because of Plaintiff's non-compliance.[7]

---

[6]    Plaintiff denies that portion of Defendants' asserted fact which states that "Senior Staff were based in the Albany office." (*Compare* Dkt. No. 45, Attach. 51, at ¶ 29 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 52, Attach. 1, at ¶ 29 [Pl.'s Rule 7.1 Resp.].) Based on the evidence Plaintiff cited and the lack of clarity as to whether Defendants intended phrases like "based" and "principal office" to mean "headquarters" rather than "official workstation," the Court finds that Plaintiff has made a valid denial of the remainder of this asserted fact. *See, supra*, note 3 of this Decision and Order (discussing the difference between "headquarters" and "official workstation").

[7]    Plaintiff denies this factual assertion, stating only "[s]ee the referenced emails for the best evidence of their contents." (Dkt. No. 52, Attach. 1, at ¶ 40 [Pl.'s Rule 7.1 Resp.].) However, Plaintiff does not cite where in the copious record evidence those specific emails can be found. Because Plaintiff's denial does not comply with L.R. 7.1 and the Court has no duty to

28. Woodward explained to Plaintiff that the DTF's principal offices were located in Albany, that the Agency's Senior Staff were based in the Albany Office, that much of his staff were in Albany, and that his failure to be present at the Albany office as often as required caused him to fail to build professional relationships with other executives as repeatedly directed by Woodward.[8]

29. At all times relevant to this litigation, the DTF maintained District Offices throughout the state from which more than 25-percent of DTF employees performed audits, collections, and other operations.

30. During his four years as Director, Plaintiff never visited the District Offices in Syracuse, Rochester, Utica, and Binghamton, and went to the Queens, Buffalo, Suffolk, and Nassau District Offices only one time each.

31. When all members of the Executive staff were asked in 2012 to speak at an opening event for the new Metrotech office, Plaintiff declined to represent the ODAA himself and instead asked for volunteers; ultimately, another staff member represented the ODAA.[9]

---

*sua sponte* scour the record for the non-specific emails Plaintiff intends to reference, this fact is deemed admitted. *See* N.D.N.Y. L.R. 7.1(3) ("Each denial shall set forth a specific citation to the record where the factual issues arise.").

[8] Plaintiff denies this asserted fact "as characterized"; however, his citation to portions of his declaration does not contradict Defendants' assertion that Woodward made such explanations to Plaintiff. (*Compare* Dkt. No. 45, Attach. 51, at ¶ 44 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 52, Attach. 1, at ¶ 44 [Pl.'s Rule 7.1 Resp.].) This fact is therefore deemed admitted. *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *N.Y. Teamsters*, 426 F.3d at 648-49.

[9] Plaintiff denies this asserted fact "as characterized"; however, the cited evidence does not contradict the fact that Plaintiff allowed another member of his staff to speak in his place. (Dkt. No. 52, Attach. 1, at ¶ 51 [Pl.'s Rule 7.1 Resp.].) This fact is therefore deemed

32.     When Plaintiff began his role as an executive, Woodward explained to him that, rather than being required to obtain specific pre-approval for time off, Woodward expected that a person at the executive level would weigh the responsibilities of his or her position with the desire for time off and would take time off when it did not conflict with responsibilities; Woodward's direct reports needed only to notify her what time they needed off and approval was presumed unless specifically advised otherwise.[10]

33.     There were numerous occasions when Woodward and other members of Woodward's staff were looking for Plaintiff and did not know where he was.

34.     Woodward eventually directed Plaintiff to report his time to Woodward's assistant, so that her assistant could track Plaintiff's use of time without Woodward needing to do so personally.

35.     Despite numerous directives on this issue, Plaintiff refused to report his time off on any regular basis.

36.     Initially, Woodward communicated her directives on this issue to Plaintiff verbally; but, eventually, Woodward felt it was necessary to memorialize these directives in writing.

---

admitted.  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *N.Y. Teamsters*, 426 F.3d at 648-49;.*Baity*, 51 F. Supp. 3d at 418.

[10]     Plaintiff admits that "Woodward did not need to pre-approve plaintiff's time off," but does not explicitly deny the rest of the asserted fact or provide evidence to support any such partial denial.  (Dkt. No. 52, Attach. 1, at ¶ 52 [Pl.'s Rule 7.1 Resp.].)  The entire asserted fact is therefore deemed admitted.

10

37.    Woodward also learned that Plaintiff failed to comply with the DTF's

requirement that he conduct prompt, thorough, and impartial investigations.

38.    Plaintiff and his staff failed to comply with the DHR order setting the deadlines

for the DTF's responses on at least six complaints.[11]

39.    Plaintiff and his staff also failed to comply with the deadlines mandated by the

EEOC for the DTF to respond to at least five charges.[12]

40.    The written policy for investigating internal complaints was changed to extend

the time from 60 days to 120 days.

41.    Woodward became aware that ODAA staff members, including Steven

McGough, went out to dinner with people who had initiated complaints through

ODAA, investigated complaints involving complainants they knew personally,

and exchanged e-mails with complainants that were more friendly in nature than

an impartial investigation required.

42.    Woodward became aware that, on one occasion, Plaintiff knowingly permitted

another staff member, Cheryl Mitchell, to investigate a complaint of

discrimination against an accused with whom she had a personal conflict.

---

[11]    Plaintiff denies this fact, asserting that the cited evidence does not support
Defendants' proposition.  (Dkt. No. 52, Attach. 1, at ¶ 60 [Pl.'s Rule 7.1 Resp.].)  However, the
cited exhibit shows that, for numerous complaints in 2011 and 2012, ODAA either (a) did not
respond, resulting in a letter from DHR questioning the non-responsiveness, or (b) responded
past the 15-day period set for response.  (Dkt. No. 45, Attach. 24.)  This fact is therefore deemed
admitted.

[12]    As was the case in footnote 11 of this Decision and Order, Plaintiff's denial based
on his assertion that the cited evidence does not support Defendants' asserted fact is contrary to a
review of that evidence.  (Dkt. No. 52, Attach. 1, at ¶ 61 [Pl.'s Rule 7.1 Resp.].)  This fact is
therefore deemed admitted.

43.    Woodward also became aware that, before this investigation, Ms. Mitchell had
had numerous arguments with the accused when they worked together and some
of those arguments involved the complainant.

44.    During the investigation, the accused complained to Woodward that the ODAA
staff member was treating him inappropriately.

45.    In 2012, Mattox and Woodward were briefed by Argi O'Leary, Assistant Deputy
Commissioner of Litigation Strategy, that the ODAA was missing legal deadlines
on many responses to the DHR and EEOC, and that their investigations were
inadequate and lacked impartiality.

46.    At that point, Woodward had had numerous conversations with Plaintiff directing
him to promptly investigate the complaints, timely serve responses to both
entities, and address issues regarding the improper investigations.

47.    Woodward previously had advised Plaintiff on numerous occasions that he and
his staff had to conduct the investigations of internal complaints in a much more
timely fashion because it was not fair to the complainant, the accused, or the
managers involved to have complaints languish.

48.    Woodward was made aware that Plaintiff's staff was conducting investigations of
individuals who were already close to them and were appearing to make friends
with individuals they first met through investigations.[13]

---

[13]    Plaintiff denies this asserted fact; however, the only portion of his denial that is
supported by the cited evidence relates to whether Woodward spoke to Plaintiff about whether
the investigations were impartial.  (Dkt. No. 52, Attach. 1, at ¶ 74 [Pl.'s Rule 7.1 Resp.].)  The
remainder of Defendants' asserted fact is therefore deemed admitted.

49. As Director of the ODAA, Plaintiff was required to maintain a working knowledge of equal employment opportunity ("EEO") initiatives and all applicable laws.

50. Due to Plaintiff's failure to take certification courses, Plaintiff was unable to conduct many of the training courses offered by the ODAA.

51. As a result, Plaintiff was unable to assist his certified staff as they conducted hundreds of training classes for the DTF.[14]

52. Plaintiff also refused to attend in-house training specifically for the ODAA.

53. The DTF conducted a three-day investigative training course in Albany from July 10th to July 12th, 2012, which was required for all ODAA, Labor Relations, and Office of Internal Affairs ("OIA") employees.

54. This training was organized to address concerns regarding the inadequacy of ODAA investigations and was intended to ensure that the staff of all three investigative units were using consistent procedures to conduct proper, effective investigations.

55. Although Plaintiff attended the first day of training, he left without notice, without explanation, and without Woodward's permission, and did not attend the final two days.

---

[14] Plaintiff denies this asserted fact; however, his citation, while providing evidence of trainings conducted by ODAA staff during his tenure as Director, does not contradict Defendants' assertion that Plaintiff himself was unable to or did not personally conduct these training classes. (*Compare* Dkt. No. 45, Attach. 51, at ¶ 81 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 52, Attach. 1, at ¶ 81 [Pl.'s Rule 7.1 Resp.].) *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *N.Y. Teamsters*, 426 F.3d at 648-49.

56.    With respect to the DTF's hiring and promotional activities, the DTF's policy required the ODAA to participate in new-hire and promotional interviews in order to promote (and monitor) the DTF's compliance with its affirmative action goals.

57.    While Plaintiff was not expected to participate in all interviews or job fairs on a regular and consistent basis, he was expected that he participate in some higher-level interviews and higher-profile job fairs.

58.    Woodward learned that Plaintiff, however, did not participate in these interviews.

59.    Moreover, Plaintiff rarely participated in the many job fairs in which the ODAA participated to attract protected class members to the DTF.

60.    On November 15, 2009, Woodward sent an e-mail to Plaintiff in which she stated that, "as far as I know, I am STILL waiting for your more sketched-out workplan with dates per our e-mails in October. When will you have it for me????"

61.    Plaintiff did not respond to Woodward's request until two weeks later (on December 1, 2009), and stated that "it is my intention to present the ODAA operational/work plan by the time of our meeting next week."[15]

62.    On July 27, 2010, Woodward asked Plaintiff why he was not responding to the e-mail request for comments on proposed legislation.[16]

---

[15]    Plaintiff "objects" to this asserted fact as "argumentative" and requests that the Court refer to the e-mails themselves; however, Plaintiff does not deny this (non-argumentative) factual assertion, which is supported by the record evidence cited.  (Dkt. No. 52, Attach. 1, at ¶ 95 [Pl.'s Rule 7.1 Resp.].)

[16]    Plaintiff "objects" to this asserted fact and requests that the Court refer to the e-mails themselves; however, Plaintiff does not deny this factual assertion, which is supported by the record evidence cited.  (Dkt. No. 52, Attach. 1, at ¶ 97 [Pl.'s Rule 7.1 Resp.].)

63.     Woodward reminded Plaintiff that she needed products ahead of time for review; he was not to give her items requiring her internal review on or after their external due dates.

64.     Woodward worked on subsequent reports with ODAA staff member Ms. Mindel because Plaintiff did not involve himself in the reports at all.

65.     In May 2011, the ODAA, in conjunction with the Management Analysis and Project Services ("MAPS") Bureau, developed and conducted a department-wide survey questioning employees on issues related to diversity and affirmative action.

66.     Although MAPS provided the survey results to the ODAA within a couple of months, Plaintiff indicated he was unsatisfied with the results and wanted to look into it further.[17]

67.     Although Woodward requested the ODAA's analysis of the results of the survey on numerous occasions, Plaintiff and his staff did not provide the report until November 2012, more than a year-and-a-half after the survey was conducted.[18]

68.     Due to the considerable amount of time that passed between publication of the survey results and the ODAA's analysis, Mattox refused to publish the report

---

[17]     Plaintiff denies this asserted fact as characterized, noting that MAPS provided the preliminary findings in September 2011; however, Plaintiff does not deny this fact other that to object to Defendants' characterization of "a couple of months."  (Dkt. No. 52, Attach. 1, at ¶ 104 [Pl.'s Rule 7.1 Resp.].)  This fact is deemed admitted.

[18]     Plaintiff denies this asserted fact, but his denial consists of adding facts in an attempt to explain why it took so long to render the report; however, these explanations do not contradict Defendants' asserted fact.  (Dkt. No. 52, Attach. 1, at ¶ 105 [Pl.'s Rule 7.1 Resp.].)  This fact is deemed admitted.  *Baity*, 51 F. Supp. 3d at 418.

because it was stale.[19]

69.    In addition, the report was poorly executed and not a factual representation of the survey results.

70.    Because of ODAA's failure, under Plaintiff's directorship, to publish the report analyzing the MAPS survey results in a timely manner, the DTF incurred a significant expense in producing a report without receiving a return on costs.

71.    According to the DTF's Office of Budget and Management Analysis, the approximate personnel costs for the MAPS bureau alone to prepare this survey were in the amount of $16,000.00.

72.    On July 5, 2011, Woodward e-mailed Plaintiff asking him for a strategic plan as had been requested by Mattox.[20]

73.    In a later e-mail, Woodward advised Plaintiff that "since [Mattox] was the one who asked for it I would have thought you would have been more responsive."[21]

74.    On February 22, 2012, Woodward had a meeting with Plaintiff and the DTF's Director of Human Resources ("HR") regarding action steps for handling complaints of employees who had been terminated on probation.

---

[19]    Plaintiff denies this asserted fact, citing to his declaration, in which he admits that Mattox "told [him] that he would not release the survey report because he claimed it was 'stale.'" (Dkt. No. 52, Attach. 1, at ¶ 106 [Pl.'s Rule 7.1 Resp.].)  The fact that Plaintiff does not believe that the report was stale does not contradict Defendants' stated fact that Mattox believed the report was stale.  This fact is therefore deemed admitted.  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *N.Y. Teamsters*, 426 F.3d at 648-49.

[20]    Plaintiff denies this asserted fact, arguing that the cited exhibit does not contain the relevant e-mail relied on by Defendants.  (Dkt. No. 52, Attach. 1, at ¶ 111 [Pl.'s Rule 7.1 Resp.].)  However, emails from July 5, 2011, referencing a "plan" Plaintiff was to work on are in the cited exhibit.  (Dkt. No. 45, Attach. 30, at 6.)  This fact is therefore deemed admitted.

[21]    *See, supra,* note 20 of this Decision and Order.

75.    On February 23, 2012, Woodward sent an e-mail instructing both Directors to write the action steps of ODAA and HR.

76.    Although the Director of HR responded the same day, Woodward had to send Plaintiff another email six days later (on February 29, 2012) asking him to provide her with the information.

77.    Plaintiff provided Woodward with the requested information on March 2, 2012.

78.    In a June 8, 2012, e-mail, Woodward directed all of her subordinates, including Plaintiff, to provide a report by June 15, 2012, regarding how they each celebrated public service recognition.

79.    On June 14, 2012, a reminder email was sent.

80.    On June 15, 2012, a third e-mail was sent to Plaintiff asking for his report.

81.    On July 30, 2012, Woodward forwarded to Plaintiff an e-mail that she had previously sent to him on February 1, 2012, seeking a report, and asked whether he had ever provided it.

82.    Plaintiff confirmed that he had not sent the report and indicated that they were still working on the report of the survey from Spring 2011, which would give the answers Woodward was seeking.

83.    Woodward also asked Plaintiff whether he had made a misconduct referral related to a different matter as discussed in a previous meeting.

84.    Only at that point did Plaintiff make the referral, prompting Woodward to ask why it took a week to do so.

85.    Plaintiff advised Woodward that, although it was difficult for him to make the referral for personal reasons, he did as she directed.

17

85.     On August 8, 2012, Woodward reminded Plaintiff that he had not provided her with his weekly summary of activities for three separate weeks.

86.     In addition to Plaintiff's failure to provide timely reports, Plaintiff made and implemented policies and procedures for the ODAA before obtaining Woodward's authorization, which he was not permitted to do because all policies and procedure changes in the ODAA had to be approved by Woodward.

87.     For example, Woodward learned that Plaintiff was tape-recording witnesses and administering oaths during investigations without receiving authority from Woodward to do so.

88.     Woodward was forced to direct Plaintiff to end these practices because they upset the unions and prompted concerns that complainants and witnesses would not come forward if they knew they would be tape-recorded.

89.     In July 2011, Plaintiff sent a department-wide e-mail regarding changes related to requests for reasonable accommodation without first discussing it with Woodward or bringing it to the attention of Senior Staff.

90.     In 2012, Mattox directed Ms. O'Leary, the newly hired Assistant Deputy Commissioner of Litigation Strategy, to review ODAA operations, particularly its investigations.

91.     Ms. O'Leary informed Mattox and Woodward that, through her investigation, she learned that the ODAA was consistently late in responding to external claims from the EEOC and DHR and consistently took a long time investigating the internal complaints, sometimes taking more than a year.

92.     Ms. O'Leary also informed Mattox and Woodward that ODAA's investigations were inadequate and lacked impartiality.

93.     After Ms. O'Leary briefed the Commissioner and Woodward on these issues, Woodward again had numerous conversations with Plaintiff directing him to promptly investigate the complaints and timely serve response to both entities.

94.     In an attempt to remediate a significant portion of the ODAA's issues, Ms. O'Leary, under the direction of Mattox, planned a three-day investigative training course in Albany that was mandatory for all members of the ODAA, Labor Relations, and OIA to ensure that the members of all three units were properly trained in investigations and that the investigations were conducted consistently and properly throughout the DTF.

95.     The training course was scheduled to take place in Albany because the majority of attendees were based there.

96.     To prepare for the training course, each of the Directors was asked to meet with the trainer on a date before the training.

97.     Plaintiff, instead of attending the preparation meeting personally, once again sent his employee, Ms. Mindel, in his place.

98.     When Plaintiff informed Ms. Mindel about the upcoming training course, Plaintiff specifically advised her that it was a three-day course and said, "[A]ll ODAA staff should be present;" yet, again, Plaintiff himself did not personally attend it.

99.     Pursuant to Mattox's directive Ms. O'Leary also organized a meeting on June 14, 2012, of the DTF's Director of Labor Relations, Director of Internal Affairs,

19

Plaintiff as Director of the ODAA, and Chief Risk Officer to create a department-wide investigations policy so that all entities conducting investigations would do so under the same rules.

100. Ms. O'Leary advised Woodward that Plaintiff failed to attend this meeting, sending Ms. Mendel in his place.

101. Ms. O'Leary further advised Woodward that, while the other Directors came to an agreement on a department-wide investigation policy during that meeting, Ms. Mindel asked for time for Plaintiff to review it.

102. While Ms. O'Leary granted Ms. Mindel's request for additional time, Ms. O'Leary advised Ms. Mindel that she wanted their response by Monday to send to Mattox and Woodward.

103. Ms. Mindel forwarded the e-mail to Plaintiff on June 15, 2012.

104. As a result, Woodward again spoke to Plaintiff about his failure to work in Albany, appear for meetings, respond to requests for information or reports, and obtain preapproval for leave.

105. In addition, Woodward told Plaintiff that, because Department personnel had difficulty locating him on many occasions due his violations of policy and Woodward's directives, he needed to advise Woodward's secretary, Ms. Hoerz, of his location daily and inform her ahead of time when he was going to travel.

106. Woodward apprised Mattox of her meeting with Plaintiff and Woodward's continued mandates.

107.  Plaintiff failed to attend the second and third day of the three-day investigation training that took place from July 10 through July 12, 2012, violating Woodward's direction for him to be present for all three days of training.

108.  Woodward later learned that, after attending the first day of training on July 10th, Plaintiff left Albany on the morning of July 11th and returned to his home in New Rochelle, New York, without advising anyone of that fact or obtaining Woodward's permission to do so.

109.  Woodward was advised that Plaintiff's secretary contacted Ms. Hoerz and told her that Plaintiff was going to New York City and would not be back to work until the next day, July 12th.

110.  Plaintiff did not appear back in his office at Metrotech in Brooklyn until Thursday, July 12th, even though the investigation training course was still taking place in Albany and the rest of his staff and the Labor Relations and OIA were there.

111.  On July 16, 2012, Woodward met with Plaintiff, at which time she addressed his failure to comply with her orders to (a) attend the training, (b) advise her that he intended to be away before going, and (c) not take time off from work without preapproval.

112.  Plaintiff cited a July 12th continuing legal education ("CLE") course at his Metrotech office as an excuse for his failure to stay for the entire investigative training.

113.    However, Woodward learned through a review of DTF records that (a) Plaintiff
was notified of the availability of this CLE for the first time on June 13, 2012, the
day after Ms. Mindel advised him by e-mail that the mandated investigation
training course was taking place from July 10th through July 12th, (b) the CLE
did not start until 1 pm on July 12th, such that Plaintiff could have stayed for the
training course on July 11th, and (c) Plaintiff was merely watching a webcast of
the CLE at the Metrotech office when the live class was actually taking place at
the DTF's Albany office.

114.    Therefore, had Plaintiff requested and received permission from Woodward, as
per proper protocol, to attend the CLE in lieu of the last half-day of the training
course, he could have attended two-and-a-half days of the training course before
attending the three-hour CLE, which started at 1 pm in the Albany offices where
the investigation training was also taking place.

115.    More importantly, Plaintiff skipped an important training course in order to
address his personal need for CLE credits.

116.    Plaintiff's status as an attorney was not a requirement of his position; however,
the investigation training was directly job-related.

117.    During Woodward's meeting with Plaintiff on July 16, 2012, she once again
ordered Plaintiff to advise Ms. Hoerz of his location daily and to provide her with
a weekly summary of his activities.

118.    Woodward also addressed other ODAA issues with Plaintiff during that meeting,
including Mattox's desire for a Buffalo Plan of Action, i.e., a plan to address
complaints of discrimination and related issues in the Buffalo district office.

119.  Plaintiff advised Woodward that he was concerned and one of the complaints he was addressing made him uncomfortable because he liked the accused and he was uncomfortable reporting information suggesting that this person might be working out of a different office than where he was assigned.

120.  Woodward advised Plaintiff that a failure to report possible misconduct was unacceptable and the matter needed to be referred for investigation.

121.  Woodward also told Plaintiff that he needed to inform her immediately whenever there was a possibility of a conflict of interest so they could decide if he needed to recuse himself.

122.  Woodward apprised Mattox about her June 16, 2012, meeting with Plaintiff.

123.  Ms. Hoerz was required to certify Plaintiff's time report as correct, but she advised Woodward that she was unable to do so because Plaintiff failed to follow the order to advise Ms. Hoerz of his location daily.

124.  Under Woodward's direction, Ms. Hoerz e-mailed Plaintiff on August 2, 2012, advising him that there were many days on his previous time report that she could not approve because she did not hear from him and did not know where he was during business hours.

125.  Plaintiff replied that is was not his understanding that he had to advise Ms. Hoerz on a daily basis of his location.

126.  Ms. Hoerz responded that she told him to provide an e-mail at the beginning and at the end of the day to let her know where he was.

127.    On August 8, 2012, Ms. Hoerz re-sent to Plaintiff an April 5, 2012, e-mail that was originally sent to all ELG members requiring that they report all outside meetings because Plaintiff was continuing to refuse to comply with that directive.

128.    On August 2, 2012, Plaintiff sent an e-mail to Mattox and Woodward complaining that he was being "scrutinized to this degree" regarding his time during 2012; he listed the July 12, 2012, CLE as an excuse for any discrepancies in his time report and stated that he had never abused time before.

129.    In response, Woodward scheduled a meeting with Plaintiff for August 9, 2012, to reinforce Woodward's directive that Plaintiff had to provide his time to Ms. Hoerz because she was responsible for attesting to the accuracy of his time reports and could not do so when he was rarely in Albany, never requested preapproval for use of leave, and decided on his own when to come and go and when to travel.

130.    Because the DTF had received reports of discrimination complaints from its Buffalo district office, Mattox and Woodward determined in 2012 that an action plan was needed to address the issues there.[22]

131.    To facilitate faster movement on the plan, Mattox scheduled a meeting for October 9, 2012, to discuss the next steps with respect to creating a better work environment in the Buffalo district office.

---

[22]    Plaintiff denies that Mattox was directly involved in this decision; however, the portions of his declaration that Plaintiff cites do not support this denial.  (Dkt. No. 52, Attach. 1, at ¶ 173 [Pl.'s Rule 7.1 Resp.].)  This fact is therefore deemed admitted.  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *N.Y. Teamsters*, 426 F.3d at 648-49.

132.    Plaintiff asked Woodward if he could invite individuals from Buffalo to the
October 9, 2012, meeting with Mattox, to which Woodward replied that Plaintiff
must make sure that he was "prepared to carry the ball in the meeting."[23]

133.    As a result of that meeting, Mattox determined that the ODAA would go to
Buffalo in November to effectuate the plan.

134.    Woodward directed Plaintiff to create a timeline for the action plan, three separate
department-wide "hot news" e-mails, and a message specifically for the Buffalo
district office.

135.    Plaintiff worked to obtain permission to rent a minivan for his travel to Buffalo,
stating that he would "be there for [two to three] days, then back to Albany," and
that he intended to bring the minivan back on Thursday, November 29, 2012.

136.    Although Woodward directed Plaintiff to provide his script for his remarks for the
Buffalo presentation, he never did.

137.    Plaintiff asked to have Ms. Mindel give the speech at the event in his place.[24]

138.    Mattox directed Plaintiff to speak because it was part of his job duties and the
event fell directly within the scope of Plaintiff's duties as Director of the ODAA.

---

[23]    Plaintiff denies this asserted fact "as characterized," urging the Court to read the
cited e-mail for its "true content." (Dkt. No. 52, Attach. 1, at ¶     177 [Pl.'s Rule 7.1 Resp.].)
However, the cited e-mail does not contradict Defendants' fact, which is therefore admitted.

[24]    Plaintiff denies the remainder of this asserted fact as being argumentative rather
than factual. (*Compare* Dkt. No. 45, Attach. 51, at ¶ 189 [Defs.' Rule 7.1 Statement] *with* Dkt.
No. 52, Attach. 1, at ¶ 189 [Pl.'s Rule 7.1 Resp.].)  The Court agrees, and therefore has omitted
that portion from this statement of material facts.

139.    The week-long Buffalo event had a kick-off in the form of a town hall meeting with the entire office on the first day, with focus group sessions scheduled for the rest of the week.

140.    The ODAA staff, including Plaintiff, was required to stay in Buffalo for the entire week of the event because this work fell directly within ODAA's job duties.[25]

141.    The only ODAA staff not present in Buffalo was the individual who conducted all of the investigations in Buffalo, one member who was brand new, and one member whose primary job was to answer the phones.

142.    Plaintiff spoke during the town hall meeting on the first day of the event.

143.    Plaintiff did not have anything else scheduled on his calendar that needed to be done that week in place of the Buffalo project.

144.    Plaintiff was not present for the majority of the most significant ODAA initiative during his time as Director.

145.    All of the executive-level employees who went to Buffalo expected Plaintiff to stay in Buffalo for the entire event; to Woodward's knowledge, Plaintiff never told the ODAA staff that he was not going to be present for the entire week.

---

[25]    Plaintiff denies this asserted fact, arguing that it is "directly belied by the e-mails contained in Ex. A-3"; however, Plaintiff does not cite a specific e-mail or e-mails that support his assertion, and the Court has not, during its ordinary review of the record, come across e-mails stating Plaintiff was not required to be in Buffalo for the week of the conference.  (Dkt. No. 52, Attach. 1, at ¶ 192 [Pl.'s Rule 7.1 Resp.].)  This fact is therefore deemed admitted.  *See, e.g., Rizzo v. Health Research, Inc.*, 12-CV-1397, 2016 WL 632546, at *2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at *1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses").

146.    Woodward expected Plaintiff to stay the entire week and received no prior request or notification from him that he was not staying for the full event.

147.    Woodward learned that Plaintiff had gone only when his secretary e-mailed her secretary that he intended to return to the Metrotech office on Wednesday afternoon.

148.    Plaintiff is believed to have left Buffalo on Tuesday morning, and he returned to Metrotech at 11:30 am on Wednesday.[26]

149.    At all times relevant to this litigation, there was a formal process in existence for DTF staff who believed they were victims of discrimination.

150.    Mr. McGough, who knew the process as an employee of the ODAA, never filed a formal complaint alleging that the complaints against him were the product of discrimination or based in discrimination.

151.    Plaintiff never filed a formal complaint alleging that the complaints against Mr. McGough were the product of discrimination or based on discrimination.

152.    The ODAA had a policy to have the complainant file a formal and confidential complaint providing details upon which to investigate a claim.

153.    The Director of the ODAA (and the ODAA itself) were encouraged to identify and root out discrimination and discriminatory practices within the Department.

---

[26]    Plaintiff denies this asserted fact; however, he acknowledges that Plaintiff returned the minivan in Albany on Wednesday and then went to the Metrotech office in Brooklyn, and that he left Buffalo "the next day" after his presentation.  (Dkt. No. 52, Attach. 1, at ¶ 200 [Pl.'s Rule 7.1 Resp.].)  This fact is therefore deemed admitted.

154.  In November 2012, following the Buffalo town hall event, Mattox made the decision to remove the investigatory function from the ODAA and transfer it to the DTF's OIA.

155.  Woodward did not participate in the decision to transfer the investigatory function from the ODAA to the OIA.

156.  Mattox's decision to remove the investigatory function from the ODAA was based on a number of factors, including the following: (a) ODAA's consistent practice of missing legal deadlines on investigations; (b) the complaints received about the ODAA's conduct and timeliness of internal investigations; (c) Plaintiff's failure to attend training courses intended to address defects in the ODAA's investigation process; (d) and Plaintiff's failure to coordinate and fully attend the Buffalo town hall and subsequent events in November 2012 that was a key DTF initiative attempting to eradicate discrimination in the workplace.[27]

157.  Woodward advised Plaintiff of the transfer of discrimination investigations from the ODAA to the OIA, and directed him to assist the OIA in that transition.

---

[27]    Plaintiff denies this asserted fact, arguing that Mattox's decision was purportedly based on "a comprehensive review that does not exist."  (Dkt. No. 52, Attach. 1, at ¶ 209 [Pl.'s Rule 7.1 Resp.].)  Although it appears that no report related to an investigation has been submitted into the record, the lack of this report does not constitute evidence contradicting Defendants' asserted fact.  Not only does paragraph 171 of Mattox's declaration sufficiently establish the asserted fact, but other evidence supports a finding that issues existed with regard to Plaintiff's timeliness in ODAA investigations and his involvement and/or attendance at noted events.  This fact is therefore deemed admitted.  However, the Court notes that acceptance of this fact does not constitute a legal conclusion that these reasons were the only reasons for this decision.

158.   The OIA investigated allegations of discrimination made by Jalisa Williams and Robert Smith, staff of the ODAA.

159.   The OIA found merit to the complaints brought on behalf of Ms. Williams and Mr. Smith, and the persons guilty of discrimination were disciplined.

160.   On January 16, 2013, Plaintiff advised Woodward that he was going to be in Albany only one day that week, to which Woodward replied that Plaintiff must be in Albany two-to-three days per week.

161.   Because Plaintiff continued to fail to comply with the directive about attendance in Albany, on February 1, 2013, Woodward sent Plaintiff another e-mail stating that the previous directive in the January 16, 2013, e-mail regarding being in Albany three days per week was not optional and that "any future deviation without prior written approval . . . will be dealt with through formal counseling."

162.   Although Woodward was involved in discussions regarding Plaintiff's poor performance and vulnerabilities for the Department, the decision to terminate Plaintiff's employment was Mattox's decision alone.[28]

163.   Mattox decided to terminate Plaintiff's employment because of Plaintiff's violation of numerous policies and his concerns about the ODAA's performance

---

[28]   Plaintiff denies this asserted fact, but fails to cite any evidence to support his denial.  (Dkt. No. 52, Attach. 1, at ¶ 222 [Pl.'s Rule 7.1 Resp.].)  Additionally, the deposition testimony of both Mattox and Woodward supports Defendants' asserted fact.  (Dkt. No. 45, Attach. 4, at 84 [Woodward Dep.]; Dkt. No. 45, Attach. 5, at 74-76 [Mattox Dep.].)  This statement is therefore deemed admitted.

under Plaintiff's leadership.[29]

164.  On May 7, 2013, Woodward provided Plaintiff with a performance evaluation that documented his deficiencies as Director of the ODAA.

165.  Woodward did not share the performance evaluation with anyone outside the DTF, nor did she share it with anyone in connection with a job application by Plaintiff.

166.  At no point did anyone ask Woodward or Mattox about Plaintiff's performance as Director of the ODAA in connection with a job application by Plaintiff after his departure from the DTF.

167.  Plaintiff admitted that Woodward told him more than once that he needed to be in Albany more often because it would be helpful for him to be there.

168.  Plaintiff admitted that what he thought was sufficient in terms of how often he needed to be in Albany may have differed from what his supervisor, Woodward, thought was sufficient.

169.  Plaintiff was given an office in Albany on Executive Row.

170.  Plaintiff testified that, throughout the time he served as Director for the ODAA, he lived in New Rochelle, New York, in Westchester County, an approximately two-and-a-half hour car journey from his office in Albany.

---

[29]      Plaintiff denies this asserted fact, citing to his own Rule 7.1 Response and his "Counter-Statement of Facts."  (Dkt. No. 52, Attach. 1, at ¶ 223 [Pl.'s Rule 7.1 Resp.].)  However, such a general citation does not comply with L.R. 7.1, which requires a non-movant to provide specific citations.  Rule 7.1(3).  Additionally, Plaintiff's counter-statement does not appear to contain any citation to admissible record evidence directly contradicting Defendants' assertion regarding Mattox's expressed reasons for terminating Plaintiff.  This fact is therefore deemed admitted.

171.    Plaintiff testified that, for the first year or two years of his time as Director, he worked in the Albany office approximately two-to-three days per week.

172.    By Plaintiff's own admission, there came a time when he stopped traveling to Albany as frequently as he did in the beginning, and he was present in the Albany office only once every two weeks (with visits lasting two-to-three days) because he did not think that there was as much of a need for him to be there on a regular basis as there had been in the beginning.

173.    Woodward was Plaintiff's direct supervisor throughout Plaintiff's time as Director of the ODAA.

174.    Plaintiff confirmed that he met regularly with Woodward and that, while Woodward did not initially memorialize their discussions at meetings in writing, at some point, Woodward began to do so because there had been times when Plaintiff misunderstood what was said and what was expected of him.

175.    Plaintiff testified that, within his first year as Director, he received an anonymous letter from someone complaining that the ODAA was helping only one group of people.

176.    Plaintiff received two or three complaints about the ODAA not conducting fair investigations, but, after inquiring with his staff, he was satisfied that there was no merit to any of the complaints.

177.    Plaintiff testified that he was aware of two or three complaints about Mr. McGough, and that one of the complaints was that Mr. McGough had an improper meeting with a female witness at a restaurant after work hours.

178. Plaintiff spoke with Mr. McGough about the complaints and was satisfied that they had no merit.

179. Woodward advised Plaintiff in November 2012 that the decision had been made to remove the ODAA's investigation function.

180. By Plaintiff's own admission, he does not know who made the decision to stop allowing the ODAA to investigate complaints.

181. Plaintiff recalled that the two main reasons given to him for removal of the investigatory functions were that (a) the ODAA was tardy in conducting investigations and other paperwork, and (b) there were allegations against Mr. McGough.

182. Plaintiff testified that it was possible that Woodward had spoken to him before November 2012 about the ODAA's tardiness in conducting investigations, but he could not recall.

183. Plaintiff also testified that it was possible that Woodward had spoke to him before November 2012 about the allegations against Mr. McGough, but he could not recall.

184. Plaintiff recalled speaking with the ODAA staff a number of times about trying to improve the ODAA's performance in terms of timeliness, but he was not sure whether his staff's performance had improved after he spoke with them.

185. Plaintiff admits that he tried to persuade Woodward and Mattox to allow the ODAA to continue to investigate complaints after he was told that the decision had been taken to remove that function from the ODAA.

186.   After Mattox informed Plaintiff that his services as Director of the ODAA were
       no longer needed, Mattox offered to reach out to the Governor's appointments
       office for him.

187.   By Plaintiff's own admission, after Mattox informed him of the decision to
       terminate him, they discussed the fact that Plaintiff was just a few months away
       from his 30-year service benchmark (which had significant financial implications
       for Plaintiff's State pension) and Mattox told Plaintiff that he would be allowed to
       remain in his position until he reached his 30 years of service.

188.   By Plaintiff's own admission, he provided Mattox with a list of two or three State
       employment positions in which he was interested, but he could not recall whether
       those positions were actually available at the time.

189.   By Plaintiff's own admission, before taking the position of Director of the
       ODAA, he had no background or training in affirmative action.

C.     **Parties' Briefing on the Pending Motion**

       1.     **Defendants' Motion for Summary Judgment**

              a.     **Defendants' Memorandum of Law**

In their motion for summary judgment, Defendants assert six arguments.  (Dkt. No. 45,

Attach. 1, at 10-24 [Defs.' Mem. of Law].)  First, Defendants argue that the retaliation claim

against Woodward should be dismissed for lack of personal involvement.  (*Id.* at 10-11.)

Specifically, Defendants argue that Woodwood was not personally involved in the decision to

transfer investigative functions from ODAA to the OIA, or in the investigation into complaints

brought by ODAA staff members that they were being subjected to discrimination.  (*Id.*)

Second, Defendants argue that, in the context of Plaintiff's retaliation claims against both Woodward and Mattox, there is insufficient evidence to show that Plaintiff engaged in protected activity.  (*Id.* at 12-15.)  Specifically, Defendants argue that Plaintiff has not provided evidence to support a finding that his actions constituted support for other employees asserting Title VII rights that would be outside the scope of his job role.  (*Id.* at 12.)  Defendants argue that Plaintiff merely reported complaints he received from staff members (an action that he performed within the ordinary course of his job) and that Defendants "understood Plaintiff to be acting within the scope of his duties as Director of the ODAA when he communicated his opinions about the complaints."  (*Id.* at 12, 15.)

Third, Defendants argue that there is insufficient evidence to show that Defendants were aware of any protected activity on Plaintiff's part.  (*Id.* at 15-16.)

Fourth, Defendants argue that there is insufficient evidence to show that Plaintiff suffered a materially adverse action.  (*Id.* at 17-18.)  Specifically, Defendants argue that the evidence is insufficient (a) as to Woodward because there is no evidence that she made the decisions to transfer investigatory functions from ODAA or to terminate Plaintiff, and (b) as to Mattox because Mattox had "little choice but to take the decision to terminate Plaintiff" based on "growing concerns about Plaintiff's insubordination and failure to improve ODAA's performance issues."  (*Id.*)  Defendants also argue that any statements by Mattox that he would reach out to the Governor's appointments office do not give rise to an adverse action because there were no openings consistent with the list of positions Plaintiff provided.  (*Id.*)

Fifth, Defendants argue that there is insufficient evidence to show a causal connection between any protected activity and a materially adverse action.  (*Id.* at 18-19.)  Specifically,

Defendants argue that Plaintiff's termination was due to poor performance and the need to protect the ODAA's affirmative action programs. (*Id.*) Defendants also argue that there is no evidence to connect protected activity with any failure on Mattox's part to reach out to the Governor's appointments office. (*Id.*)

Sixth, and last, Defendants argue that, even if Plaintiff could establish a *prima facie* case of retaliation, there were legitimate, non-discriminatory reasons for Plaintiff's termination, including poor performance and Plaintiff's violations of policies and directives. (*Id.* at 19-24.) Defendants also argue that the lack of open jobs meeting Plaintiff's expressed preferences is a legitimate, non-discriminatory reason for Mattox's failure to take any further action related to finding Plaintiff another job with the New York State government. (*Id.*)

### b.    Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiff makes four arguments. (Dkt. No. 52, at 12-25 [Pl.'s Opp'n Mem. of Law].)  First, in opposition to Defendants' second and third arguments, Plaintiff argues that the evidence shows he was engaged in protected activity of which Defendants were aware. (*Id.* at 12-16.)  Specifically, Plaintiff argues that this Court is bound to adopt the findings previously made in relation to Defendants' motion to dismiss, in which the Court determined that Plaintiff was engaged in protected activity that went beyond merely conveying others' complaints. (*Id.* at 13-14.)  Plaintiff also argues that the deposition testimony establishes that at least Woodward was aware that Plaintiff was reporting unlawful discrimination; he argues that it is not relevant whether Defendants would have subjectively believed that his actions were protected. (*Id.* at 14-16.)

35

Second, in opposition to Defendants' fourth argument, Plaintiff argues that his termination was an adverse action. (*Id.* at 16.)

Third, in opposition to Defendants' fifth argument, Plaintiff argues that a reasonable jury could find that there was a causal connection between Plaintiff's reporting of discrimination and his termination. (*Id.* at 17-24.) Specifically, Plaintiff argues that Plaintiff's reports occurred in late 2012 and January 2013, and he was informed of the termination on February 7, 2013, a temporal proximity that suggests a causal connection. (*Id.* at 18.) Plaintiff argues that, under the applicable law, the Court need find only that retaliation was a motivating factor rather than the main reason for his termination to survive a motion for summary judgment. (*Id.* at 18-20.) Plaintiff relatedly argues that Defendants' proffered reasons for his termination were pretextual because (a) Defendants ignore Plaintiff's many accomplishments as ODAA Director, (b) the evidence shows that he was not required to work in Albany and that Defendants were holding him to different standards than the standard to which they held other Senior Staff, and (c) the only performance evaluation he received in his time as ODAA Director was after he had already been terminated. (*Id.* at 21-23.) Plaintiff also argues that the sequence of events and evidence related to Mattox's withdrawal of his offer to assist Plaintiff in finding a new job with New York State creates a triable issue of fact as to whether that act was taken in retaliation. (*Id.* at 23-24.)

Fourth, in opposition to Defendants' first argument, Plaintiff argues that a reasonable jury could find that Woodward was personally involved, particularly because Woodward was Plaintiff's direct supervisor and he had little contact with Mattox. (*Id.* at 25.)

### c.    Defendants' Reply Memorandum of Law

Generally, in reply to Plaintiff's opposition memorandum of law, Defendants make six arguments.  (Dkt. No. 55, at 4-13 [Defs.' Reply Mem. of Law].)  First, Defendants argue that Woodward was not personally involved in the alleged retaliation because there is no evidence that Woodward had the power to fire Plaintiff, and that Plaintiff's arguments regarding personal involvement are merely speculative.  (*Id.* at 4-6.)

Second, Defendants argue that there is insufficient evidence to show that Plaintiff was engaged in protected activity, asserting that Plaintiff has not shown that he had a good-faith reasonable belief that he was engaged in protected activity, and that the first alleged time when Plaintiff reported discriminatory actions to his supervisors did not occur until after Mattox had decided to take investigatory powers away from ODAA.  (*Id.* at 7-9.)

Third, Defendants argue that Plaintiff does not adduce evidence controverting the fact, or even dispute the fact, that they believed that Plaintiff was acting within the scope of his duties when he engaged in protected activity. (*Id.* at 9.)

Fourth, Defendants argue that Plaintiff's termination was not a materially adverse action because Plaintiff had been permitted to remain in his job as Director until he attained his 30 years of service with the State, which allowed him to qualify for increased pension benefits. (*Id.*)

Fifth, Defendants argue that Plaintiff has not shown that retaliation was a motivating factor in his termination because his arguments are based entirely on unsubstantiated suspicions about Defendants' motives.  (*Id.* at 10.)  Defendants also argue that there is no evidence that Plaintiff suffered any adverse effects from the negative performance evaluation he received after his termination.  (*Id.*)

37

Sixth, and last, Defendants argue that there are legitimate, non-discriminatory reasons for

Plaintiff's termination, in particular, the shortcomings in his performance.  (*Id.* at 11-13.)

## II.    GOVERNING LEGAL STANDARDS

### A.    Legal Standard Governing a Motion for Summary Judgement

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record]

evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[30]  As for the materiality requirement, a dispute of

fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ.

---

[30]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are
insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.
1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more
than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*
*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

P. 56(a), (c), (e).[31]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[32]  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[33]

---

[31]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

[32]    *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[33]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[34]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B.    Legal Standards Governing Retaliation Claims Under 42 U.S.C. §§ 1981 and 1983 and NYHRL § 296(6)

Retaliation claims brought together under 42 U.S.C. § 1981 and  N.Y. Exec. L. § 296(6) are analyzed pursuant to Title VII principles.  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 [2d Cir. 2004]; *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 [2d Cir. 1996]).  Retaliation claims are analyzed using a three-step burden-shifting analysis.  First, the plaintiff must establish a *prima facie* case of

---

[34]      *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

retaliation by showing the following four elements are met: (a) the plaintiff participated in a protected activity; (b) the defendant knew of the protected activity; (c) the plaintiff suffered an adverse employment action; and (d) there is a causal connection between the protected activity and the adverse employment action. *Hicks*, 593 F.3d at 164. "The plaintiff's burden in this regard is '*de minimis*,' and 'court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.*

Second, if the plaintiff presents a *prima facie* case of retaliation, the defendant must "'articulate a legitimate, non-retaliatory reason for the adverse employment action.'" *Id.*

Third, the plaintiff must then show that the defendant's proffered reasons were a mere pretext for retaliation. *Pompey-Howard v. New York State Edu. Dept.*, 275 F. Supp. 3d 356, 367-38 (N.D.N.Y. 2017) (Kahn, J.).

## III.    ANALYSIS

### A.    Whether Woodward Was Personally Involved in the Violations Alleged

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 45, Attach. 1, at 10-11 [Defs.' Mem. of Law].) To those reasons, the Court adds the following analysis.

An individual's personal liability under 42 U.S.C. §§ 1981 and 1983 "must be predicated on the actor's personal involvement." *Patterson*, 375 F.3d at 229; *see also Back v. Hastings on Hudson Union Free Sch. Dist.* 365 F.3d 107, 122 (2d Cir. 2004) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Section 296(6) of the NYHRL similarly requires that the defendant "actually participated" in the discriminatory/retaliatory action. *Beattie v. Guilderlan Cent. Sch. Dist.*, 124

41

F. Supp. 2d 802, 805 (N.D.N.Y. 2000) (Hurd, J.).  "Individuals may be personally liable under the NYHRL and § 1981 where the individual possessed power to do more than carry out personnel decisions made by others, or is shown to have actually participate[d] in the conduct giving rise to a discrimination claim."  *Karam v. Cty. of Rensselaer, New York*, 13-CV-1018, 2016 WL 51252, at *18 (N.D.N.Y. Jan. 4, 2016) (D'Agostino, J.) (citations and internal quotation marks omitted); *accord Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) ("An individual may be held liable under §§ 1981 and 1983 only if that individual is personally involved in the alleged deprivation.") (citations and internal quotation marks omitted); *Vosburgh v. Amer. Nat. Red Cross*, 08-CV-0653, 2014 WL 4826688, at *13 (N.D.N.Y. Sept. 29, 2014) (Kahn, J.) ("To be found liable under [New York Executive Law § 296(6)], an individual need not have supervisory or hiring and firing power but still must have *actually participated* in the conduct giving rise to the claim of discrimination and engaged in direct, purposeful, participation."); *Frank v. Lawrence Union Free Sch. Dist.*, 688 F. Supp. 2d 160, 174 (E.D.N.Y. 2010) (noting that "the NYSHRL's aiding and abetting section imposes individual liability on a person who 'actually participates' in the improper conduct [and t]he New York Court of Appeals has never held otherwise").  Personal involvement for purposes of a NYSHRL claim will suffice to establish personal involvement in behavior unlawful under 42 U.S.C. § 1983.  *See Feingold v. New York*, 366 F.3d 138, 160 (2d Cir. 2004) ("Feingold has presented sufficient evidence to permit the conclusion that all of the named individual defendants were personally involved in behavior unlawful under the NYSHRL. . . . He has also, therefore, presented sufficient evidence to permit the conclusion that they were personally involved in behavior that violates Section 1983.") (citations and internal quotation marks omitted).  Personal involvement may be established by evidence showing the following:

42

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Littlejohn*, 795 F.3d at 314 (quoting *Back*, 365 F.3d at 127).

Courts in this Circuit have found personal involvement to exist where, for example, the individual defendant (1) signed a written notice that the plaintiff would not be reinstated, or (2) was involved in the decision to terminate the plaintiff. *See, e.g., Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 169 (E.D.N.Y. 2005) (finding defendant was personally involved where the complaint alleged that defendant "was the individual that signed the letter that informed [plaintiff] that she would not be reinstated" and "was personally involved in the decision to terminate the Plaintiff"); *Duse v. IBM Corp.*, 748 F. Supp. 956, 968 (D.Conn. 1990) (finding a genuine issue of fact where a dispute existed regarding whether a supervisor did more than just sign a termination letter). On the other hand, courts have also held that "[i]nvolvement in discussions that lead to a decision is not personal involvement under § 1983." *Conklin v. Cty. of Suffolk*, 859 F. Supp. 2d 415, 441 (E.D.N.Y.2012) (quoting *Zdziebloski v. Town of E. Greenbush, N.Y.*, 336 F. Supp. 2d 194, 202 [N.D.N.Y. 2004] [Kahn, J.]).

Defendants focus on two actions when arguing that Woodward was not personally involved in the violation in question: (1) the decision to transfer the ODAA's investigatory function, and (2) the processing of claims of discrimination and/or retaliation alleged by Plaintiff's staff. (Dkt. No. 45, Attach. 1, at 10-11 [Defs.'s Mem. of Law].) Plaintiff, however, argues that the most relevant action related to Woodward was the decision to terminate Plaintiff,

and argues that there is a genuine dispute of material fact as to whether Woodward was personally involved in the decision to terminate him.  (Dkt. No. 52, at 25 [Pl.'s Opp'n Mem. of Law].)  Defendants reply that, because Mattox was the person who ultimately decided to terminate Plaintiff, Woodward was not personally involved.  (Dkt. No. 55, at 4-6 [Defs.' Reply Mem. of Law].)

As to the decision to transfer the ODAA's investigatory functions, the Court agrees with Defendants that the evidence does not establish that Woodward was personally involved in this decision.  Notably, Woodward testified at her deposition that Mattox made the decision to remove the investigatory function from the ODAA, and that she did not give any input with respect to that decision, although she did speak to Plaintiff about that decision after it had been made and communicated to her by Mattox.  (Dkt. No. 45, Attach. 4, at 47:8-16, 49:10-50:16 [Woodward Dep.].)  In her declaration, Woodward reiterated that she did not participate in the decision to transfer the investigatory function from the ODAA to the OIA.  (Dkt. No. 45, Attach. 7, at ¶ 222 [Woodward Decl.].)  In his declaration, Mattox stated that "[t]he decision to remove the investigative function from ODAA was part of a broader change with respect to investigations within the DTF" and that "Woodward did not participate in" that decision.  (Dkt. No. 45, Attach. 6, at ¶¶ 169-70 [Mattox Decl.].)  Mattox also stated that he "asked Ms. Woodward to advise [Plaintiff] of the move of discrimination investigations from ODAA to OIA and direct him to assist OIA in this transition."  (*Id.* at ¶ 173.)  Because Plaintiff has failed to produce any evidence contradicting the statements by Mattox and Woodward, he has not shown that there is a genuine dispute of material fact as to whether Woodward was personally involved in the decision to transfer the investigatory function to the OIA.

As to the processing of claims by ODAA staff, the Court agrees with Defendants that Woodward was not personally involved in the processing of these claims for the reasons stated in Defendants' memorandum of law. (Dkt. No. 45, Attach. 1, at 10 [Defs.' Mem. of Law].) Plaintiff has offered no evidence to contradict these reasons or to create a genuine dispute of material fact as to whether Woodward was personally involved in the investigation or handling of the relevant complaints of discrimination made by ODAA staff members.

As to Plaintiff's termination, Defendants are correct that Mattox and Woodward both testified that Mattox was the person who made the ultimate decision to terminate Plaintiff. (Dkt. No. 45, Attach. 4, at 84:2-13 [Woodward Dep.]; Dkt. No. 45, Attach. 5, at 74:14-16 [Mattox Dep.].) Consequently, the only way in which Woodward could be personally involved in Plaintiff's termination would be if she recommended or otherwise influenced Mattox's decision. During his deposition, Mattox was unable to provide a clear answer as to whether Woodward had provided an informal recommendation that Plaintiff be terminated; he stated that there had been no formal recommendation, but that "informally, Ms. Woodward, as [Plaintiff's] supervisor, had shared with [him] concerns about his competence." (Dkt. No. 45, Attach. 5, at 75:15-25 [Mattox Dep.].) However, as already stated, mere involvement in discussions leading to a decision does not constitute personal involvement. *Conklin*, 859 F. Supp. 2d at 441. In addition, Mattox stated in his declaration that "Woodward did not participate in my decision to terminate [Plaintiff's] employment." (Dkt. No. 45, Attach. 6, at ¶ 202 [Mattox Decl.].) In her deposition, Woodward testified that she did not recall or did not believe that Mattox asked her whether Plaintiff should be terminated or for a recommendation about Plaintiff's termination. (Dkt. No. 45, Attach. 4, at 84:2-13 [Woodward Dep.].) In her declaration, Woodward clarified that "[a]lthough I was involved in discussions regarding [Plaintiff's] poor performance and

vulnerabilities . . . the decision to terminate [Plaintiff] was [Mattox's] decision alone." (Dkt. No. 45, Attach. 7, at ¶ 237 [Woodward Decl.].)

The evidence from Mattox and Woodward's depositions and declarations fatally undermine Plaintiff's argument that Woodward was personally involved in the decision to terminate him. The mere fact that Woodward was Plaintiff's supervisor and that he had little direct contact with Mattox are not sufficient, on their own, to create a genuine dispute of material fact sufficient to overcome a motion for summary judgment.[35] Of note, Plaintiff does not cite any evidence that contradicts the accounts provided by Woodward and Mattox with anything more than speculation. (Dkt. No. 52, at 25 [Pl.'s Opp'n Mem. of Law].)

As a final matter, the Court notes that it specifically found, as part of the Decision and Order of July 5, 2016, on Defendants' motion to dismiss, that "Plaintiff [did] not allege facts plausibly suggesting that Woodward was personally involved in the decision to terminate Plaintiff's employment." (Dkt. No. 27, at 30 n.12 [Decision & Order, 7/5/2016].) Rather, the only actions about which this Court found plausible allegations of personal involvement were related to Woodward's action of telling Plaintiff that the investigatory function was being

---

[35] The Court notes that, even though Defendants relied heavily on Woodward's declaration in their Rule 7.1 Statement, such reliance does not create a credibility issue necessitating trial on this issue. (Dkt. No. 52, at 25 [Pl.'s Opp'n Mem. of Law].) A non-movant cannot create a genuine dispute of material fact by simply challenging the credibility of a declarant. *See, e.g.*, *McCollough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999) (explaining that a plaintiff does not create a genuine issue of fact merely by "impugning [a witness'] honesty"); *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 391 (S.D.N.Y. 2012) ("Neither conclusory assertions, nor contentions that the affidavits supporting the motion are not credible, create a genuine issue of material fact."); *Chem. Bank v. Hartford Acc. & Indem. Co.*, 82 F.R.D. 376, 378 (S.D.N.Y. 1979) ("[A] naked attack upon the affidavits of a moving party is, without more, insufficient to place the credibility of the affiant in issue."). In any event, as can be seen from the Court's summary of the deposition testimony from both Woodward and Mattox, as well as Mattox's declaration, there is more evidence supporting Defendants' arguments than just Woodward's declaration.

transferred from the ODAA to the OIA and her disregard of Plaintiff's concerns about complaints of racial discrimination made by ODAA staff.  (*Id.* at 30-31.)  Plaintiff's reliance on his termination as the basis for asserting personal involvement by Woodward is therefore improper as well as unsupported by the admissible evidence of record.

For the above reasons, the Court grants Defendants' motion for summary judgment as to Woodward based on a lack of personal involvement such that all of Plaintiff's claims against her are dismissed.

### B. Whether Defendant Mattox Has Established Entitlement to Summary Judgment on Plaintiff's Retaliation and Aider/Abettor Claims

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Plaintiff's opposition memorandum of law as to Plaintiff's Section 1981 and 1983 claims.  (Dkt. No. 52, at 12-24 [Pl.'s Opp'n Mem. of Law].)  To these reasons, the Court adds the following analysis.  However, the Court answers this question in the affirmative as to Plaintiff's Section 296(6) claims for the reasons stated in this Decision and Order.

### 1. 42 U.S.C. §§ 1981 and 1983 Retaliation Claim

#### a. Protected Activity

"Protected activities typically refer to 'actions taken to protest or oppose statutorily prohibited discrimination,' such as 'the filing of a formal complaint with the Equal Employment Opportunity Commission or making complaints to management about an activity that the employee reasonably believes violates the law.'"  *Venezia v. Luxoticca Retail N. Am. Inc.*, 13-CV-4467, 2015 WL 5692146, at *11 (S.D.N.Y. Sept. 28, 2015) (quoting *Gioia v. Forbes Media LLC*, 09-CV-6114, 2011 WL 4549607, at *10 [S.D.N.Y. Sept. 30, 2011], *aff'd*, 501 F. App'x 52 [2d Cir. 2012]).  Courts within the Second Circuit have analyzed whether a plaintiff engages in a

47

protected activity for purposes of a retaliation clam pursuant to § 1981, § 1983, and the NYHRL under the same standard as whether a plaintiff engages in a protected activity for purposes of a retaliation claim pursuant to Title VII. *See, e.g., Littlejohn*, 795 F.3d at 316, 320 (concluding that plaintiff's complaint alleged facts plausibly suggesting that she engaged in a protected activity under Title VII's anti-retaliation provisions, 42 U.S.C. § 2000e-3[a], and that her Title VII and § 1981 retaliation claims therefore should not have been dismissed as to certain defendants); *Nieblas-Love v. New York City Housing Auth.*, 14-CV-5444, 2016 WL 796845, at *6-7 (S.D.N.Y. Feb. 26, 2016) (explaining that, "[f]or each of Plaintiff's [retaliation] claims [pursuant to, *inter alia*, Title VII, § 1981, and the NYSHRL], 'protected activity' means action taken to protest or oppose statutorily prohibited discrimination") (citing, *inter alia*, *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 313 n.11 [2004]); *Cooper v. New York Dep't of Labor*, 14-CV-0717, 2015 WL 5918263, at *6-7 (N.D.N.Y. Oct. 9, 2015) (Suddaby, J.) (concluding that plaintiff did not allege facts plausibly suggesting that she engaged in a protected activity under Title VII and *Littlejohn*, and dismissing plaintiff's Title VII and NYHRL retaliation claims).

The Second Circuit has explained that, although reporting or investigating other employee's complaints of discrimination is not itself a protected activity where the employee is required as part of his job duties to make such reports or investigation, an employee in a job with such duties can still be engaged in protected activity where his actions "support other employees in asserting their Title VII rights or personally complains or is critical about the discriminatory employment practices of [his] employer." *Littlejohn*, 795 F.3d at 318 (internal quotation marks omitted). The relevant analysis is therefore whether Plaintiff's actions go beyond merely reporting claims of discrimination such that they constitute advocacy for other employees or Plaintiff's own concerns or criticisms of the DTF's attitude or response to discrimination.

Whether or not the law of the case doctrine would require the Court to adhere it its previous findings regarding the question of whether Plaintiff engaged in protected activity (given any similarity between the factual allegations of Plaintiff's Complaint and the record evidence before the Court), the Court finds that it would nonetheless adopt a similar finding here based on the record evidence.  *See Johnson v. Holder* 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'").  In the Decision and Order of July 5, 2016, on Defendants' motion to dismiss, this Court found that the following activities by Plaintiff constituted "more than merely conveying others' complaints concerning discrimination pursuant to the responsibilities attendant to his role with ODAA": (a) reporting concerns of prevalent discrimination to Mattox and Woodward,[36] citing specific examples; (b) stressing his opinion that the DTF had to be "willing to take action" to address these issues; (c) conveying good-faith concerns that complaints towards ODAA staff might be being made by individuals being investigated by those staff members; and (d) advocating for the reinstatement of the investigatory function in the ODAA.  (Dkt. No. 27, at 26-27 [Decision & Order, 7/5/2016].)

Plaintiff alleges that he made the following statements to Woodward and Mattox before his termination on February 7, 2013: (1) in November 2012, he "voiced his view" to Mattox about the results of the MAPS study that Mattox refused to release, arguing that "the concerns it raised about sexual harassment, racism, and bullying in the workplace remained topical and

---

[36]     Even though the Court has found that Woodward was not personally involved in the alleged retaliatory actions, the evidence establishes that Woodward and Mattox spoke with each other about ODAA and Plaintiff; and so conversations between Plaintiff and Woodward may still be relevant to determining the elements of Plaintiff's retaliation claims as to Mattox.

should be addressed"; (2) on November 30, 2012, Plaintiff expressed objections to Woodward about complaints made against ODAA investigator Mr. McGough, stating that he believed those accusations might reflect bias by the accusers; (3) also on November 30, 2012, Plaintiff told Woodward that "it appeared to [him] to be discriminatory to transfer EEO investigations from an office that was mainly comprised of employees of color to one that was made up entirely of white employees"; (4) in January 2013, Plaintiff told Mattox that he believed that discrimination was widespread in the DTF and needed to be better addressed, as well as that he thought that transferring EEO investigations from the ODAA to the OIA would weaken the DTF's ability to address and prevent discrimination and that the reasons for the decision to transfer investigations "seemed to stem from the very same discriminatory attitudes that the ODAA was tasked with addressing"; (5) at the January 2013 meeting with Mattox, Plaintiff also provided two examples of specific discriminatory conduct that he believed demonstrated the prevalent discriminatory attitude in the DTF; (6) on January 11, 2013, Plaintiff again expressed to Woodward his view that removing investigations from ODAA was likely the result of discriminatory bias; and (7) also on January 11, 2013, Plaintiff expressed his view that promoting a white union worker without posting the position in accord with agency procedures would be counter to the goals of non-discrimination and equal employment opportunity.  (Dkt. No. 52, Attach. 12, at ¶¶ 37, 51, 55-60 [Pl.'s Decl.]; Dkt. No. 45, Attach. 4, at 58:3-30 [Woodward Dep.]; Dkt. No. 45, Attach. 5, at 67:22-68:13, 68:24-69:9-71:5 [Mattox Dep.].)  In addition to the statements and concerns Plaintiff made directly to Mattox, record evidence establishes that Mattox and Woodward communicated with each other on a regular basis (including about Plaintiff); this evidence suggests that Mattox might have been aware of the statements and concerns Plaintiff expressed

to Woodward.[37]   However, even considering only the statements that Plaintiff made to Mattox, a reasonable fact-finder could find that Plaintiff's acts of expressing his complaints and concerns to Mattox was more than merely conveying others' complaints, particularly based on Plaintiff's concern of far-reaching discrimination in DTF that was being exacerbated by DTF's alleged failure to adequately address or remedy the problem (such as suppressing the MAPS survey results) and his concern that transfer of investigatory functions from a department comprised of primarily protected-class individuals to a department comprised of primarily white individuals would further exacerbate the existing problem.   There is therefore a genuine dispute of material fact about whether these complaints constituted protected activity.

Whether Defendant Mattox believed these complaints and concerns to be within the scope of Plaintiff's role as Director of the ODAA is of little, if any, materiality given the substance of the communications.   Rather, what is material is whether there is admissible record evidence establishing that Plaintiff lacked a "good-faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII."   *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013) (finding that the belief of the defendant about the nature of the complaints was "of no moment, as the first element of the *prima facie* case explicitly contemplates the belief of the plaintiff, not the employer").   There is not.   Additionally, Plaintiff

---

[37]      Mattox testified at his deposition that he had formally scheduled meetings with Woodward and other deputy commissioners and selected senior managers on a weekly basis, but, because his office was next to Woodward's, it was easy for them to meet on an informal basis; they also corresponded by e-mail.   (Dkt. No. 45, Attach. 5, at 29:8-30:17 [Mattox Dep.].) Mattox also testified that he had discussed accusations of improper behavior raised at the Buffalo town hall training course with Woodward and "other senior personnel" after the town hall occurred; the town hall predated Plaintiff's termination and was the basis of some of the complaints he expressed to Woodward and Mattox.   (*Id.* at 47:6-23.)

notes instances when he expressed concern over the DTF's practices that suggest he had a good-faith belief that he was opposing unlawful practices, including his opposition to Woodward's desire to promote a white union employee without posting the job opening, a decision that Plaintiff stated would "be counter to the goals of non-discrimination and equal employment opportunity." (Dkt. No. 52, Attach. 12, at ¶ 60 [Pl.'s Decl.].) Summary judgment on this issue is therefore not appropriate.

**b.     Defendant Mattox's Knowledge of Protected Activity**

"[I]mplicit in the requirement that the employer [has] been aware of the protected activity is the requirement that it is understood, or could reasonably have been understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Kelly*, 716 F.3d at 15.

Defendants argue that there is insufficient evidence to show that Defendant Mattox knew that Plaintiff was engaging in protected activity. (Dkt. No. 45, Attach. 1, at 15-16 [Defs.' Mem. of Law].) The Court does not agree. Rather than addressing why Plaintiff's conversations and e-mails (in which he expressed concerns or opposition to various incidents and decisions that he perceived to be either discriminatory or detrimental to equal opportunity or affirmative action goals) do not constitute notice to Defendants that Plaintiff was engaged in protected activity, Defendants engage in an unrelated discussion about Plaintiff's alleged shortcomings as Director. (*Id.*) As Plaintiff notes in his opposition memorandum of law (and as supported by his declaration, his deposition testimony, and other evidence), he expressly communicated his concerns to Mattox. (Dkt. No. 45, Attach. 3, at 92-100, 178-81 [Pl.'s Dep.], Dkt. No. 45, Attach. 4, at 58-59 [Woodward Dep.]; Dkt. No. 45, Attach. 5, at 68-69 [Mattox Dep.]; Dkt. No. 52, at 16 [Pl.'s Opp'n Mem. of Law]); *see also Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007) (finding that the plaintiff had pled sufficient facts to show awareness of protected activity where she had

52

complained directly to a university employee); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (finding knowledge of protected activity established where the plaintiff had complained to an officer of the company and maintained her complaint during a subsequent internal investigation).

To the extent that Defendants' argue in their reply brief that the relevant issue is whether they believed Plaintiff was acting within the scope of his duties, the Court has already determined that there is at least a genuine issue of material fact as to whether Plaintiff had a good-faith, reasonable belief that he was engaging in protected activity, and it is Plaintiff's belief (rather than Mattox's) that is relevant to the analysis. *Summa*, 708 F.3d at 126.[38] Summary judgment on this issue is therefore not appropriate.

### c.    Adverse Action

Actions taken by employers are materially adverse actions if they are "'harmful to the point that they could dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks omitted). "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *DiBrino v. Dept. of Veteran's Affairs*, 118 F. App'x 533, 534 (2d Cir. 2004) (internal quotations marks omitted).

Plaintiff alleges that his termination from his position as Director of the ODAA is a materially adverse action. (Dkt. No. 52, at 16 [Pl.'s Opp'n Mem. of Law].) Courts in this circuit have found that termination is an adverse employment action sufficient to support a retaliation

---

[38]    To the extent that Mattox argues that his belief that Plaintiff was acting within the scope of his employment is sufficient to overcome Plaintiff's allegations that he believed he was engaged in more than simply conveying the complaints of others, this argument is unpersuasive. Notably, Mattox failed to cite any legal authority to support this argument.

claim. *See Costa v. Sears Home Imp. Products, Inc.*, 65 F. Supp. 3d 333, 349 (W.D.N.Y. 2014)

("Plaintiff's termination alone is an adverse employment action sufficient to support her

retaliation claim."); *Reynoso v. All Foods, Inc.*, 908 F. Supp. 2d 330, 342 (E.D.N.Y. 2012)

("[T]ermination clearly constitutes an adverse employment action."); *Risco v. McHugh*, 868 F.

Supp. 2d 75, 113 (S.D.N.Y. 2012) ("[T]he only materially adverse action that [plaintiff]

conceivably suffered subsequent to engaging in protected activity was her termination."); *Roman*

*v. Cornell University*, 53 F. Supp. 2d 223, 245 (N.D.N.Y. 1999) (McAvoy, C.J.) ("Plaintiff's

termination unquestionably constitutes an adverse action."); *see also Ejiogu v. Grand Manor*

*Nursing & Rehab. Ctr.*, 15-CV-0505, 2017 WL 1322174, at *4 (S.D.N.Y. Apr. 5, 2017) ("The

termination of employment is an adverse employment action under any standard.").

However, despite the fact that Plaintiff was terminated, Defendants argue that there is

insufficient evidence that Plaintiff suffered a materially adverse action, focusing particularly on

(a) Mattox's stated reasons for terminating Plaintiff's employment, (b) the fact that Mattox

allowed Plaintiff to remain employed until he reached his 30-year employment milestone, which

entitled him to greater pension benefits, and (c) the fact that Mattox did contact the Governor's

appointments office on Plaintiff's behalf, but there were no openings in any of Plaintiff's

preferred positions. (Dkt. No. 45, Attach. 1, at 17-18 [Defs.' Mem. of Law].) The Court finds

all three of these reasons unpersuasive.

First, whether or not Mattox had legitimate reasons to terminate Plaintiff has little

bearing on the question of whether Plaintiff suffered an adverse action. Rather, those reasons are

relevant only after Plaintiff has established a *prima facie* case of retaliation.

Second, the fact that Mattox allowed Plaintiff to remain employed for a few months after

being notified of the determination to terminate him (and the fact that Plaintiff reaped a benefit

from that allowance) does not negate the adverse impact of Plaintiff's termination.  In particular, the Court is not convinced that Mattox's concession in allowing Plaintiff to reach his 30-year milestone is sufficient to mitigate the adverse effect of permanent termination of his employment.  Notably, Defendants cite no case law supporting their argument that a reasonable person would not be dissuaded from engaging in protected activity if they knew their pension benefits would be preserved, even though their employment would be terminated.

Third, whether or not Mattox complied with his offer to attempt to assist Plaintiff in finding another position with the New York State government is irrelevant to the issue of whether his termination constituted a materially adverse employment action, particularly because Plaintiff remained unemployed despite the offer.  Again, Defendants cite no authority to support their argument that such an offer mitigates the adverse effect of Plaintiff's termination.

Based on the above, the Court finds that Plaintiff's termination constituted a materially adverse action.  Summary judgment is therefore not appropriate on this issue.

### d.    Causal Connection Between the Protected Activity and Adverse Action

"[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by 'showing that the protected activity was closely followed in time by the adverse [employment] action.'" *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (quoting *Reed*, 95 F.3d at 1178).

Defendants argue that there is no evidence to support a causal connection between any protected activity and adverse actions; in particular, Defendants argue that there is no evidence to support a causal connection between Plaintiff's activity and Mattox's decision to terminate his employment because that decision was taken "in recognition of Plaintiff's poor performance and

the need to protect ODA[A]'s affirmative action programs."  (Dkt. No. 45, Attach. 1, at 18-19

[Defs.' Mem. of Law].)  However, Defendants argument again misses the relevant point, which

is not whether Mattox had a legitimate, non-retaliatory reason for terminating Plaintiff's

employment, but rather whether the circumstances and temporal proximity between the protected

activity and Plaintiff's termination could give rise to an inference of a causal connection.  *El

Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (finding that the plaintiff

arguably established a *prima facie* case of retaliation "[b]y demonstrating proximity between his

complaint and his discharge," even though temporal proximity alone was not sufficient to

establish that the defendant's reasons were pretextual).

 The Court finds that the temporal proximity between Plaintiff's reports and complaints

and his termination are sufficient to establish at least a genuine dispute of material fact as to

whether there is an inference of a causal connection between those reports and complaints and

his termination.  As detailed above in Part III.B.1.a of this Decision and Order, Plaintiff has set

forth multiple statements he made in the months leading up to his termination.  (Dkt. No. 52,

Attach. 12, at ¶¶ 37, 51, 55-60 [Pl.'s Decl.].)  All of those complaints or expressions of concern

over the DTF's handling of discrimination and equal opportunity issues occurred approximately

three months or less before Plaintiff's termination (with some occurring only one month or less

before his termination).  Although the Second Circuit has not made a clear finding as to what the

outer limits of temporal proximity are for analyzing whether a causal connection might exist, the

close temporal proximity in this case at the very least raises a genuine dispute of material fact as

to whether a reasonable fact-finder could conclude that a causal connection exists between

Plaintiff's actions and his termination.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273

(2001) (citing cases finding a temporal proximity of three months and more to be insufficient);

*Gorman-Bakos*, 252 F.3d at 554-55 (finding that four months between protected activity and adverse action "is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion"); *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("The three-week period from Kwan's complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity."); *cf. Chamberlin v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007) (finding five months between the protected activity and adverse action was not close enough to create in inference of a causal connection). Summary judgment on this issue is therefore not appropriate.

### e.    Legitimate, Non-Retaliatory Reasons

Because a reasonable fact-finder could find that Plaintiff could establish a *prima facie* case of retaliation, the burden shifts to Defendant to show that there were legitimate, non-retaliatory reasons for terminating Plaintiff's employment. *Hicks*, 593 F.3d at 164. Defendants have provided more than sufficient evidence to meet this burden (in relation to their argument that Plaintiff's employment was terminated due to his poor job performance and failure to follow directions from his supervisor), and Plaintiff does not appear to contest that Defendants have sufficiently met their burden on this issue. (Dkt. No. 45, Attach. 1, at 19-24 [Defs.' Mem. of Law]; Dkt. No. 52, at 18 [Pl.'s Opp'n Mem. of Law].) The Court therefore finds that Defendants have proffered legitimate, non-retaliatory reasons for Plaintiff's termination.

### f.    Pretext for Retaliation

To defeat summary judgment at this stage in the analysis, the plaintiff must show more than just mere temporal proximity. *El Sayed*, 627 F.3d 933-34. Rather, the plaintiff must "come forth with some evidence of pretext in order to raise a triable issue of fact." *Mavrommatis v. Carey Limousine Westchester, Inc.*, 476 F. App'x 462, 466 (2d Cir. 2011).

The parties disagree as to whether the correct standard applicable to Plaintiff's Section 1981 claim when determining this issue is the traditional "but-for" standard applied in Title VII cases, or a less-demanding "motivating-factor" standard.  (Dkt. No. 45, Attach. 1, at 22 [Defs.' Mem. of Law]; Dkt. No. 52, at 18-19 [Pl.'s Opp'n Mem. of Law]; Dkt. No. 55, at 10 [Defs.' Reply Mem. of Law].)  The Second Circuit case cited by Plaintiff, *Garcia v. Hartford Police Dept.*, 706 F.3d 120 (2d Cir. 2013), states that, "to defeat summary judgment," in a Section 1981/1983 retaliation case, the plaintiff need not "show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Garcia*, 706 F.3d at 127.  However, the Second Circuit in *Garcia* relied on precedent that pre-dated the Supreme Court's decision in *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).[39]  In *Nassar*, the Supreme Court held that, for Title VII claims where the plaintiff alleges retaliation based on activities such as opposition to unlawful workplace discrimination, the applicable causation standard is not the motivating factor standard, but rather the but-for standard (i.e., that the harm alleged would not have occurred but for the defendant's conduct).  *Nassar*, 570 U.S. at 342-43, 360.  Judges of this District have noted that the Supreme Court has not clarified whether the holding in *Nassar* related to the standard for Title VII claims also applies to Section 1981 claims.  *Wenchun Zheng v. Gen. Elec. Co.*, 15-CV-1232, 2016 WL 10859373, at *14 n.19 (N.D.N.Y. Jan. 12, 2016) (Hummel, M.J.) *Report-Recommendation adopted by* 2016 WL 447496 (N.D.N.Y. Feb. 4, 2016) (McAvoy, J.); *Hexemer v. Gen. Elec. Co.*, 12-CV-1808, 2015

---

[39]        Plaintiff also relied heavily on the rationale in *St. Ange v. ASML, Inc.*, 10-CV-0079, 2015 WL 7069649 (D. Conn Nov. 13, 2015), when arguing that *Nassar* does not apply to Section 1981 retaliation claims.  (Dkt. No. 52, at 18-20 [Pl.'s Opp'n Mem. of Law].)

WL 3948418, at *6 n.1 (N.D.N.Y. June 29, 2015) (Kahn, J.). However, more-recent Second Circuit decisions than *Garcia* have applied the but-for standard to Section 1981 and NYHRL claims. *See Alvarado v. Norstrom, Inc.*, 685 F. App'x 4, 7-8 (2d Cir. 2017) (noting that Section 1981 and NYHRL claims are analyzed according to same principles as Title VII claims and affirming the dismissal of the Section 1981 and NYHRL claims because the record lacked sufficient evidence to support plaintiff's argument under the but-for standard); *Varno v. Canfield*, 664 F. App'x 63, 66 (2d Cir. 2016) (applying the but-for standard, citing *Nassar*); *see also Pompey-Howard*, 275 F. Supp. 3d at 367-68 (N.D.N.Y. 2017) (Kahn, J.) ("In order to succeed on a retaliation claim after a defendant has established a legitimate, non-discriminatory reason for the adverse action, the plaintiff must present evidence that retaliation was the but-for cause of the action.") (quoting *Varno*). Defendants acknowledge that, even pursuant to the but-for causation standard, a plaintiff does not need to show that retaliation was the only cause of the adverse action, but rather that the adverse action would not have occurred unless there was a retaliatory motive. (Dkt. No. 45, Attach. 1, at 21 [Defs.' Mem. of Law].) *See Zann Kwan*, 737 F.3d at 846 ("[B]ut-for causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.").

Plaintiff has not adduced admissible record evidence from which a rational factfinder could conclude that he has satisfied the but-for standard. Notably, the undisputed material facts regarding the ODAA's untimely submissions and Plaintiff's failure to follow directions given by Mattox and Woodward (set forth above in Part I.B of this Decision and Order) are more than sufficient to overcome Plaintiff's argument that the adverse actions would not have occurred in the absence of a retaliatory motive.

Alternatively, even if applying the less-demanding motivating factor standard, the Court would find that Plaintiff has not raised a genuine dispute of material fact as to whether his reporting of complaints and concerns was a motivating factor in Defendant Mattox's decisions to remove the investigatory function from the ODAA or to terminate his employment. To be sure, Plaintiff attempts to dispute factual issues related to his job performance such as what Woodward instructed Plaintiff to do and when, whether various reports were late or not submitted, whether Plaintiff complied with rules for attending meetings, and the amount of time Plaintiff was expected to work from Albany throughout his tenure as Director of the ODAA. However, as detailed extensively in Part I.B of this Decision and Order, Plaintiff failed to adequately establish a factual dispute as to the vast majority of the legitimate, non-retaliatory reasons proffered by Defendants. Nor has Plaintiff adduced any record evidence establishing a genuine dispute of material fact as to whether retaliation was a factor (let alone a motivating factor) in Mattox's decisions other than the temporal proximity between his complaints and the adverse actions. As already noted, temporal proximity is not enough to sustain Plaintiff's burden at this stage. *See El Sayed.* 627 F.3d at 933 (finding that temporal proximity alone was not sufficient to establish that the defendant's reasons were pretextual). Granted, Plaintiff cites the fact that Woodward had never issued a negative performance evaluation (or any formal performance evaluation) regarding his job performance until after he had been terminated. However, this fact does not establish that Mattox acted in part based on a retaliatory motive because the reasons given in the performance evaluation as to Plaintiff's deficient performance and insubordination are consistent with the other record evidence from the relevant time period and the undisputed facts discussed in Part I.B of this Decision and Order; this suggests that such

reasons were not simply fabricated after the fact to hide a retaliatory motive. (Dkt. No. 45, Attach. 47, at 6.) Additionally, Plaintiff's citation to certain accomplishments or achievements during his tenure as Director of the ODAA do not in any way establish that Defendants' proffered reasons were pretextual because it is undisputed that Defendants had significant specific concerns about Plaintiff's performance and ability to follow directions based on Plaintiff's own actions, despite any positive things Plaintiff might have achieved. Plaintiff simply has not adduced evidence from which a rational fact-finder could conclude that retaliation was a motivating factor in Mattox's decisions.

Because Plaintiff has not met his burden to show that there is at least a genuine dispute of material fact as to whether the reasons proffered by Defendants were pretext for retaliation under either the but-for or the motivating factor standard, the motion for summary judgment on Plaintiff's retaliation claim pursuant to 42 U.S.C. §§ 1981 and 1983 is granted and those claims are dismissed.

### 2.    NYHRL § 296(6) Aider and Abettor Claim

Section 296(6) of the NYHRL provides that "it shall be unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. L. § 296(6). To recover damages under this section, the plaintiff must show that (a) he was engaged in conduct protected by the NYHRL, (b) there is a causal connection between the protected conduct and the alleged retaliation in violation of § 296, and (c) the defendant "actually participated" in the discrimination. *Beattie v. Guilderlan Cent. Sch. Dist.*, 124 F. Supp. 2d 802, 805 (N.D.N.Y. 2000) (Hurd, J.).

However, there are two important questions of law that must be resolved: (1) whether Mattox can be held liable as an aider/abettor despite the fact that the DTF has been dismissed in this action and therefore cannot be found liable, and (2) whether Mattox, as the sole remaining Defendant in this case, can be held liable as an aider/abettor despite the fact that he is also the alleged principal actor in the retaliatory conduct.

As to the first question, multiple courts (including this court) have held that an individual cannot be held liable as an aider/abettor under Section 296(6) unless liability is first established as to the employer. *See Wenchun Zheng v. Gen. Elec. Co.*, 15-CV-1232, 2016 WL 10859373, at *5 (N.D.N.Y. Jan. 12, 2016) (Hummel, M.J.) *report and recommendation adopted by* 2016 WL 447496 (N.D.N.Y. Feb. 4, 2016) (McAvoy, J.) ("[I]f the employer is found not liable for violating the NYHRL, the individual employee cannot be held liable either."); *M.O.C.H.A. Soc., Inc. v. City of Buffalo*, 872 F. Supp. 2d 264, 297 (W.D.N.Y. 2012) (collecting cases); *Curcio v. Roosevelt Union Free Sch. Dist.*, 10-CV-5612, 2012 WL 3646935, at *20 (E.D.N.Y. Aug. 22, 2012) (relying on *M.O.C.H.A. Soc.* when granting summary judgment on the plaintiff's Section 296[6] claim); *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010) (Sharpe, J.) ("[S]ince it is the employer's participation in the discriminatory practice which serves as the predicate for the imposition of liability on others for aiding and abetting, . . . a plaintiff cannot prevail against [an individual] on her state . . . claims unless she can first establish the liability of [her employer.]") (internal quotation marks omitted).[40]  However, the

---

[40]     It is worth noting, however, that some courts have also found the opposite: that an employee can still be liable under Section 296(6) even if the employer has been dismissed or found not liable for discrimination. *See Wenchun Zheng*, 2016 WL 10859373, at *5 (collecting cases).  However, because the Second Circuit's findings on the definition of "employer" in the NYRHL appears to include supervisors who were personally involved in the alleged acts (as will be discussed), whether or not the dismissal of the DTF as a defendant in this case is fatal to Plaintiff's Section 296(6) claim need not be decided.

NYHRL does not specifically define "employer."  *See* NYHRL § 292(5) (noting only that an "employer" does not include any employer with fewer than four persons except in specifically excepted situations not applicable here).  Courts have acknowledged and applied the Second Circuit's finding in *Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004), that a supervisor is an "employer" within the meaning of the NYHRL (and therefore subject to personal liability) if the supervisor "actually participates in the conduct giving rise to [the] discrimination."  *Feingold*, 366 F.3d at 157; *Wenchun Zheng*, 2016 WL 10859373, at *4; *Lamere v. New York State Office for the Aging*, 03-CV-0356, 2005 WL 1174068, at *15 (N.D.N.Y. Apr. 27, 2005) (McAvoy. J.).  Because Mattox held a supervisory position over Plaintiff, with the power to terminate Plaintiff's employment in particular, and because he actually participated in the actions that Plaintiff alleges to be retaliatory, the applicable law suggests that Mattox might qualify as an employer, a finding which indicates that he could be held liable under Section 296(6) despite the fact that the DTF (Plaintiff's more obvious employer) cannot be held liable based on their dismissal.

However, this finding does not resolve the issue, but instead leads to the second question: whether Mattox can be held liable as an aider/abettor for conduct in which he was the principal (and, in this case, sole) actor.  The law regarding this issue (and regarding the interpretation of Section 296(6)) is unsettled, with differing opinions between the courts in this circuit and in New York State courts.  *See Wenchun Zheng*, 2016 WL 10859373, at *2-5 (providing a discussion of the conflicting law on this issue and citing cases).  This Court has previously recognized that "an individual cannot be held liable for aiding and abetting their own violations of the NYHRL." *Seale v. Madison Cnty.*, 929 F. Supp. 2d 51, 69 (N.D.N.Y. 2013) (Suddaby, J.).  Recently, in the context of affirming dismissal of a Section 296(6) claim, the Second Circuit found that, although

the plaintiff alleged that the defendant "alone aided and abetted," "an individual cannot aid and abet their own discriminatory conduct."  *Boonmalert v. City of New York*, 17-1465, 2018 WL 496846, at *4, – F. App'x – (2d Cir. Jan. 22, 2018) (citing *Strauss v. New York State Dept. of Educ.*, 805 N.Y.S.2d 704, 709 [N.Y. App. Div. 3rd Dept. 2005]).

The Court therefore finds that Mattox cannot be found to have aided and abetted conduct in which he was the principal and sole participant.  Consequently, Defendants' motion for summary judgment on this issue is granted and Plaintiff's claim pursuant to NYHRL § 296(6) is dismissed.[41]

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 45) is **GRANTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

Dated: March 21, 2018
       Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge

---

[41]    Although Defendants did not raise any specific arguments regarding Plaintiff's Section 296(6) claims, they acknowledged in their memorandum of law that those claims survived the previous motion to dismiss, and they requested, as relief on their motion for summary judgment, that "summary judgment be granted and the Complaint be dismissed in its entirety."  (Dkt. No. 45, Attach. 1, at 24 [Defs.' Mem. of Law].)  Because Plaintiff's Complaint includes the Section 296(6) claims, the Court construes Defendants' motion for summary judgment as applying to all the remaining claims in the Complaint.